will hear the final case to be argued this morning, United States v. Acevedo-Baldera. Mr. Sullivan, you may proceed. Thank you. May it please the court, my name is Robert Sullivan and I represent defendant Appellant Andres Acevedo-Baldera. In 1988, this court in Ojeda-Rios, a case involving a 32-month delay, observed that trial court Judge Cleary had been understandably reluctant to release Ojeda-Rios from pretrial confinement given the allegations of Appellant's past pattern of violent acts and disregard of his In that case, the court went on to observe that at the same time, Judge Cleary had been faced with continuous delays in getting Appellant's and his co-defendants' case to trial largely because of the zealous, perhaps morally zealous, pretrial demands of the defendants. We also don't have that here. The Ojeda-Rios case is important because it's a famous Wells Fargo robbery. What were the reasons for the delay here? In this case? Yeah. The primary reason for delay was that it began with my client and his co-defendant were appointed CJA counsel at the beginning. Between the two of them, they asked for nine continuances and your client changed counsel three times, right? Actually, Your Honor, that is not correct. If you were to say between the two of them, my client's co-defendant required quite a few continuances because he changed counsel, I believe, five times. My client did not. Your client changed counsel three times. Respectfully, I would not put it quite that way, Your Honor. He was appointed CJA counsel at the beginning. Then the only counsel he selected was Attorney Cal Cagney, but the government moved to recuse Mr. Cal Cagney on grounds of conflict. My client was appointed myself to serve as CJA counsel. He did not actually, quote-unquote, change counsel three times. He only picked counsel once. He has stayed with that counsel ever since the judge ordered that Mr. Cal Cagney could not represent both parties. The brief that I submitted, the reply brief I submitted the other day, walks through each one of the continuances the government attempts to attribute to us. I submit the only request for continuance that my client actually asked for that he could be attributed to was the very first one his CJA lawyer asked when he first got discovered. Your Honor, even if that were the case, the Ojeda-Rio case points out in that case there were many, many, many pretrial demands of the defendants. The only pretrial demand one could try to attribute to my client was a switch in lawyers. Anyway, that is the Ojeda-Rio case, which is a violent case involving machete wielders, the paramilitary terrorist organization responsible for multiple acts of terrorism, including the murders of two servicemen, and a $7 million theft, and a 32-month delay. In that case, this court reversed, and in the case before, Your Honor, we don't have any of that. A very similar case was... The case is scheduled for trial in September, is that right? That's correct, which will mean he will have been waiting 38 months by that point. I would also mention the Gonzalez-Claudio case, where it was merely a 14-month delay, and this court overturned, respectfully, Judge Cleary. It was also the Wells Fargo case. The final case I wanted to mention was the Briggs case in 2012, where in that case, there was a 26-month delay, but Judge Calabresi said he was deeply troubled by the length of detention, and notwithstanding a credible source that Briggs had stated an intention to flee or take his own life upon pretrial release, the family was seeking to identify informants with suggestions of reprisal. There were two convictions. Briggs was in charge of a large-scale drug operation, and there were myriad motions that he participated in, so I see that my time is up. Respectfully, none of that exists in my case, and I reserve the minute. The court, please. We'll hear from the government. May it please the court. My name is Brian Leeming. I'm an Assistant United States Attorney here in the District of Connecticut. I'll start where counsel left off as to the due process argument. There's no dispute that 33 months is a long time, but there's also no dispute that the government did not contribute at all to that delay. The delay is attributable to either one or both of the defendants for the multiple motions for extensions of time, for pretrial motions that were filed, for supplemental briefing that was also requested and submitted as it relates to the motion to suppress, and the request for additional time to prepare for trial, all of which was complicated just over 14 months ago when the pandemic shut down the courts and most court activity initially for a couple months, but continuously since then there have been no jury trials in the District of Connecticut. Was this case scheduled for trial at some earlier point, but then delayed because of the pandemic? It was delayed periodically. It was given different sort of placeholder dates to see how the pandemic was going to play out. There was an attempt in the fall by the District Court here to start trials, but they were unable to empanel a jury, so they suspended again the jury trials. That order was scheduled to be lifted in early May. We did have a conference because Judge Thompson did prioritize this case and did report that he would be prepared to try the case in June of this year. The government reported that it would be prepared to go, but both counsel asked for additional time, and based upon other scheduling issues with witnesses and counsel, the September date was agreed upon by all lawyers and the judge. What is the indication that he's a danger to the public if he were to be out on bail? The danger, as all three of the judges have talked about, is the very seriousness of the conduct, the amount of drugs involved, the particular dangerousness of the drugs. As your honor is well aware, I'm not sure what it's like in New York, but in Connecticut we've set another record for overdose deaths. There's no question that drugs are dangerous, but there's no flat rule that anybody who's going to trial on a drug case is a threat to the public. If you really look at this, it looks as though he was employed by Valerio, and Valerio may be a drug dealer. If you look at this, he basically seems to be a gopher for Valerio, and he was working for Valerio in what could appear to any employee to be a legitimate business. What is it he did in all of this that makes him a danger to the public? I would submit, your honor, that Mr. Acevedo played a critical role in the drug trafficking operation led by Mr. Valerio. One, he was the person who occupied and lived at the apartment where the six kilograms of the fentanyl analog were found, where the drug proceeds and the drug paraphernalia were found. He had the key to that apartment. He was identified by the landlord as living in that apartment, and the evidence, as outlined in the previous submissions, substantiate an important relationship between the two. Both the magistrate judges found about the significant role he played. Just a couple months before the search warrants were executed, he traveled to the D.R., Mr. Valerio and a third man. All three of them were carrying $9,500 in cash. They were, again, heading to the Dominican Republic, and it was significant because they gave all of that. What interests me is, what's there to make anyone think that he'd be a danger to the public if Mr. Valerio is in jail? At this high level, I would suggest, to your honor, based upon other evidence that we've had, including information from confidential sources, is that Mr. Acevedo does have relationships with people where he could obtain drugs. I would also focus the court as to the significant flight risk that both magistrate judges found, that he had strong ties to the Dominican Republic, that he had essentially no ties to the District of Connecticut. Facing almost a certainty of his removal from the country and a mandatory prison term, both magistrate judges found that he had a very strong incentive to flee. Obviously, that was a part of the analysis, and that's the lower threshold that the court must find only by preponderance, that he presents a flight risk and that the conditions proposed do not reasonably assure his appearance in court. I think it was really a combination of the flight risk and the dangerousness. Obviously, the court found at all three different occasions that the nature and circumstances of the certainly for our district. I see I've gone over my time. I'm happy to answer any further questions by the panel. Thank you. Mr. Sullivan, you can have your rebuttal. Thank you, your honor. In Gonzalez de Claudio, which also sprung from the Wells Fargo case, this court said specifically, and I quote, what is significant is the absence of any prior acts specifically evidencing likelihood of flight. There is no finding and no evidence that either appellant has ever fled from lawful authority or failed to honor court orders. The evidence relied on by this district court concern primarily the nature of the offense charged, the connection of the defendants to the offense and their involvement in terrorist organization. Although these circumstances provide a reasonable basis for inferring the appellants might flee rather than attend their trial, they do not establish that risk to a degree sufficient to render continued detention within constitutional limits. And that was a 14 month delay. Respectfully, your honor, Judge Jacobs, I think the gopher is precise. Is it true that you had a trial date for June and asked for more time? Respectfully, your honor, that's not entirely accurate. We all got together at a trial setting conference with Judge Thompson in May. We all agreed on dates in July. They were fixed to take place in July. The judge concluded the conversation by saying, now everybody get off the phone and if anybody has any problems with that date, get back to me. Attorney Leeming, my friend from Connecticut here, several days later contacted the court and said, unfortunately, we cannot accommodate that date. Our investigator is not available. So he proposed backing it up to June when not only was I not available, but more fundamentally, my co-defendant's new counsel said, I'm just not ready. So we were all set to go in July until the government said they couldn't make it. And they said, but we'll do it at our convenience in June. Neither one of us could do it. And even if I were prepared to do it, my co-defendant's counsel said he couldn't. So that's not completely correct. So we took the next date the court had available, which was to keep your client in the District of Connecticut. He has, however, he has, where is his family located? He has a wife and kids. He has a wife and kids, Your Honor, and they are located in New Jersey. They are also from the Dominican Republic. His wife, they originally got divorced, but they got back together before this trial, before he got arrested. And her father came from the Dominican Republic. When you say they got together, do you mean they remarried? They have not yet remarried. They were arrested. He was arrested before they were able to conclude that. They're raising a six-year-old child together. Her mother's, her father came from the DR, served in World War II. He's a physician in New Jersey. His mother is a very, very well-respected person who does all sorts of charitable work, long-time relations, and they came from the DR. That's as it may be, but the question is, what's the prospect that he might flee? Well, respectfully, Your Honor, I think this court, in Gonzalez-Claudio, Judge Newman specifically said what I just read, which is the mere fact that he has a connection with another country is not enough. And he's willing to be on a bracelet, any sort of GPS monitoring, any sort of work requirement the court could impose. He was working at a legitimate operation. That Tintagel Automotive was a legitimate, it exists today. It's a legal operation repairing cars. So he's absolutely prepared to do anything necessary to secure an appropriate release and show up in trial. Does he have a trade? Is he a mechanic? Mostly working on cars. And he's here legally. He came here legally on a 24. I see my time has well expired. I really appreciate the court's time. Thank you both. The court will reserve decision. And the last case, as I noted, is on submission. Accordingly, I'll ask the deputy to adjourn. First tense adjourned. Thank you, judges. I'll catch you later.